UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| HASSAN M. AHMAD | ) | Case No. 14-14380-RGM |
| | ) | Chapter 13 |
| _____ | ) | |
| | ) | |
| SHAMSIYA SHERVANI | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | Adversary Proceeding No. 15-01001 |
| HASSAN M. AHMAD | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HASSAN M. AHMAD | ) | |
| d/b/a NUBANI & HASSAN | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE HASSAN M. AHMAD | ) | |
| LAW FIRM, PLLC | ) | |
| d/b/a THE HMA LAW FIRM | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## AMENDED COMPLAINT OBJECTING TO DISCHARGEABILITY

COMES NOW the Plaintiff, Shamsiya Shervani, by counsel, and for her Amended

Complaint Objecting to the Dischargeability of her claims against the Defendant, Hassan M.

Ahmad, Defendant, pursuant to 11 U.S.C. § 523 (a)(2)(4), states as follows:

*Robert L. Vaughn, Jr., VSB 20633*
*O'Connor & Vaughn LLC*
*11490 Commerce Park Drive, Suite 510*
*Reston, VA 20191*
*T – 703-689-2100*
*F – 703-471-6496*

## PARTIES AND JURISDICTION

1. Plaintiff, Shamsiya Shervani ("Ms. Shervani"), is an individual and a resident of Fairfax County, Virginia.

2. Defendant, Hassan M. Ahmad ("Mr. Ahmad"), is an attorney currently licensed and practicing law in the Commonwealth of Virginia, with an office located at 1039 Sterling Road, Suite 204, Herndon, Virginia 20170. At the time of the majority of the events complained of herein, Mr. Ahmad was practicing law in Virginia but was not licensed in the Commonwealth, having not obtained his Virginia license until June 15, 2012. At all times pertinent, Mr. Ahmad held himself out to the general public, and to Ms. Shervani in particular, as an able, competent and experienced attorney, knowledgeable in the field of personal injury law in the Commonwealth, and qualified and capable of representing the interests of Ms. Shervani. Mr. Ahmad further represented to Ms. Shervani that he was able to perform the duties and responsibilities and comply with the standard of care required of attorneys and law firms in representing clients such as Ms. Shervani.

3. Defendant, The Hassan M. Ahmad Law Firm PLLC, doing business as The HMA Law Firm ("HMA Law Firm") is a professional corporation which was organized pursuant to the laws of the Commonwealth of Virginia on or about June 18, 2010. Mr. Ahmad is a member of the HMA Law Firm and, upon information and belief, is, and has been since its formation, the sole owner and managing member of the HMA Law Firm.

4. At least as of May 25, 2009, and for a period of time thereafter, Mr. Ahmad practiced law under the name of Nubani & Ahmad, with offices located at 1568 Spring Hill Road, Suite 222, McLean, Virginia 22102. The other member of the firm of Nubani & Ahmad

was Ashraf Nubani ("Mr. Nubani"), an attorney licensed and practicing in the Commonwealth of Virginia.

5.     The acts by the Defendants complained of herein by Ms. Shervani principally took place in Fairfax County, Virginia, where at all pertinent times, Mr. Ahmad, Nubani & Ahmad, and the HMA Law Firm were engaged in the practice of law.

6.     This court has jurisdiction of this controversy under 28 U.S.C. §§ 1334 and 157(a).

7.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I) to the extent it seeks a determination of nondischargeability; the request for monetary damages is non-core.    Venue is proper in this Court under 28 U.S.C. §§ 1409(a).

## FACTS OF THE COLLISION

8.     On April 28, 2009, at approximately 3 p.m., Ms. Shervani was operating her 2004 Volkswagen Passat on the Fairfax County Parkway in Herndon, Virginia.  Ms. Shervani took the Spring Street exit off the Parkway.  The subject intersection is controlled by a traffic light which at the time was "red" for traffic heading in the direction that Ms. Shervani was heading.  Ms. Shervani's vehicle came to a full and complete stop, a safe distance behind another motor vehicle which was waiting for the light.

9.     At all times pertinent herein, Ms. Shervani was wearing her seat belt; her motor vehicle was operating properly, and free of any defects.

10.    While stopped at the light, suddenly and without notice, Ms. Shervani's vehicle was struck with great force and violence from behind by another vehicle being operated by a Ms. Annie G. B. Pena ("Ms. Pena").

3

11. The force of the impact from Ms. Pena's vehicle to the rear of Ms. Shervani's vehicle drove Ms. Shervani's car into the rear of the vehicle in front of her, causing a second collision.

12. The force of the impact also caused Ms. Shervani to be thrown violently about her vehicle, among other things, striking her knee on the dashboard of the car.

13. Despite her injuries, and after absorbing the immediate shock of the incident, Ms. Shervani and the driver who was in the vehicle in front of her, were able to exit their respective motor vehicles, at which point they came into contact with Ms. Pena.

14. Ms. Pena initially resisted calling the police, but after Ms. Shervani insisted, Ms. Pena did so, exclaiming to the effect, "Oh, I'll call the cops, I do this all the time."

15. Officer L. C. Anderson of the Fairfax County Police responded to the scene. Based upon his investigation, he determined that Ms. Pena was solely at fault for the collision.

16. Although Ms. Shervani was in significant pain and discomfort, she was able to drive her vehicle home. That afternoon and through the course of the night, the pain and discomfort intensified, at which point she presented herself to the emergency room at Reston Hospital Center. At the time of her presentation, Ms. Shervani was experiencing neck and back pain, pain in the right hip, and right knee. After examination and diagnostic testing, Ms. Shervani was diagnosed as having sustained cervical strain with cervicalgia, trapezius strain, and strain of the right knee as a result of the collision. She was given a prescription for pain medication and a muscle relaxant and instructed to follow up with her primary care physician and an orthopedic specialist.

17. Ms. Shervani's condition continued to deteriorate, necessitating additional medical care and treatment. Initially, her injuries were attempted to be treated conservatively through rest, physical therapy, and medication.

18. Ultimately, conservative treatment was not sufficient, and Ms. Shervani was required to undergo extensive additional medical care, treatment and rehabilitation, including but not limited to, multiple injection therapies, right hip arthroscopic surgery in May 2010, right inguinal hernia repair in June 2011, left wrist arthroscopic surgery and triangular fibro cartilage complex repair in June 2011 with follow up surgery in October 2012, and surgery for right shoulder rotator cuff repair, subcromial decompression and labral repair in October 2012.

19. As of this date and time, Ms. Shervani continues to experience pain in her shoulder, neck, back and right knee, as a direct and proximate result of the collision of April 28, 2009, which, in turn, has necessitated ongoing treatment for fibromyalgia.

20. At the time and place of the aforesaid collision, it was the duty of Ms. Pena to operate her motor vehicle with reasonable care and with due regard for others using the highways of the Commonwealth of Virginia, including Ms. Shervani.

21. Notwithstanding said duties, Ms. Pena did carelessly, recklessly, and negligently operate her motor vehicle, including, but not limited to, failing to pay full time and attention, failing to maintain her vehicle under proper control at all times, failing to stop for Ms. Shervani's vehicle, and otherwise failing to operate her motor vehicle in accordance with the traffic rules and regulations then and there in place.

5

## FACTS OF THE LEGAL REPRESENTATION

22. On May 25, 2009, Ms. Shervani sent an email to Mr. Ahmad regarding the collision and inquiring about obtaining his legal assistance with respect to a claim against Ms. Pena. A copy of said email is attached as **Exhibit A**.

23. On May 26, 2009, Mr. Ahmad responded with an email stating that Ms. Shervani needed legal assistance and affirmatively represented that his firm could handle the case.

24. In the email of May 26, 2009, Mr. Ahmad stated that he was not licensed in Virginia but that Mr. Nubani would be the "attorney of record" on her case. A copy of said email is attached as **Exhibit B**.

25. Notwithstanding the aforesaid communication, Mr. Ahmad did not consult with Mr. Nubani before writing the aforesaid email, and did not inform him of Ms. Shervani's interest in retaining Nubani & Ahmad to represent her in the subject personal injury claim.

26. Notwithstanding the aforesaid communication, Mr. Nubani practiced exclusively immigration law and rarely if ever appeared in the Virginia courts; up until that point in time, Mr. Ahmad's practice was almost exclusively, if not exclusively, immigration law. Mr. Nubani had no experience as an attorney handling personal injury claims, and to the extent Mr. Ahmad had any such experience, it was extremely limited. Neither Mr. Ahmad nor Mr. Nubani informed Ms. Shervani of the true nature of their practices or of their lack of experience in handling personal injury claims; to the contrary, at all times, Mr. Ahmad affirmatively represented, and lead Ms. Shervani to believe, that he was able and competent to handle Ms. Shervani's case. The foregoing representations and omissions were material in Ms. Shervani's decision to retain Mr. Ahmad's services.

6

27.     On or about June 1, 2009, in reliance upon the representations of Mr. Ahmad and of Nubani & Ahmad, Ms. Shervani entered into a written retainer agreement ("Retainer Agreement") prepared by Mr. Ahmad and/or on his behalf, pursuant to the terms of which Nubani & Ahmad was retained to represent her with regard to her claim for personal injuries arising out of the collision caused by Ms. Pena. A copy of the Retainer Agreement is attached hereto as **Exhibit C**.

28.     At the time of their retention, Mr. Ahmad and Nubani & Ahmad knew that the claim of Ms. Shervani was governed by Virginia law and that any action which would be filed on her behalf would need to be filed in the courts of the Commonwealth. Mr. Ahmad and Nubani & Ahmad also knew that only an attorney licensed in Virginia would be able to file a claim on behalf of Ms. Shervani in the courts of the Commonwealth.

29.     As of at least September 2009, Mr. Ahmad and Mr. Nubani terminated the practice of Nubani & Ahmad, and Mr. Ahmad began to practice as the Hassan M. Ahmad Law Firm with offices located at 1568 Spring Hill Road, Suite 200A, McLean, Virginia 22102. Sometime after the split, Mr. Ahmad related to Ms. Shevani that the firm had split, but assured her that the split would not affect her case, that he continued to represent her and was capable and competent to do so.

30.     As of the time that Mr. Ahmad and Mr. Nubani terminated the practice of Nubani & Ahmad, Mr. Ahmad had not consulted with Mr. Nubani with regard to any aspect of Ms. Shervani's claim, including with regard to the statute of limitations, nor did he disclose to Ms. Shervani that he had not done so or that he did not, in fact, know the Virginia statute of limitations.

7

31.    On November 11, 2009, Mr. Ahmad wrote letters to several of Ms. Shervani's medical care providers on the letterhead of Hassan M. Ahmad Law Firm PLLC advising them that "this Firm now represents the interests of Shamsiya Fatima Shervani." At the time the letter was written, the Hassan M. Ahmad Law Firm PLLC did not exist, and in fact, did not come into existence until June 18, 2010. A copy of the aforesaid letters and of the records of the Virginia State Corporation Commission regarding the formation of the Hassan M. Ahmad Law Firm PLLC are attached as **Exhibits D and E**, respectively.

32.    On or about March 1, 2010, Ms. Shervani received a letter from the insurance carrier for Ms. Pena which, by coincidence, was also her own insurance carrier, with a settlement offer. The letter was sent to her and not to Mr. Ahmad. Ms. Shervani forwarded the letter to Mr. Ahmad and requested his advice on what to do in response. Mr. Ahmad advised her to reject the offer. Ms. Shervani, in reliance upon his advice, rejected the offer. Mr. Ahmad thereafter contacted the insurance carrier and rejected the offer.

33.    On or about April 29, 2010, Mr. Ahmad relayed to Ms. Shervani that the case was still in the "collect-documents" stage, and that he had "entered my appearance" as Ms. Shervani's attorney with the insurance carrier.

34.    On June 22, 2010, a non-attorney from Mr. Ahmad's office contacted Ms. Shervani and related that she was "working on your demand letter" and requested information about how the accident occurred." Ms. Shervani responded on the same day with the requested information.

35.    On July 28, 2010, the same non-attorney from Mr. Ahmad's office contacted Ms. Shervani and related that "I am almost done with the demand letter" and requested that Ms. Shervani obtain a letter from her employer detailing the hours and wages lost as a result of the

collision. On the same day, Ms. Shervani responded that she had sent a request to her employer for the information. Ms. Shervani also asked for information regarding the status of the demand and whether she would be able to see it and approve it before it was submitted.

36. The following day, July 29, 2010, Ms. Shervani provided the information requested regarding her lost wages for her former employer and on August 10th, the requested information regarding her then current employer; Ms. Shervani followed up the next day, at Mr. Ahmad's request, with a letter on the employer's letter head with the same information

37. By email of August 25, 2010, Mr. Ahmad assured Ms. Shervani that "we are staying on top of the situation." Despite the use of the term "we," Mr. Ahmad was a solo practitioner, was not licensed in Virginia, and had no attorney in his office licensed in Virginia. At no time had Mr. Ahamd consulted with Mr. Nubani and/or any other Virginia attorney regarding Ms. Shervani's claim, including their filing a lawsuit on her behalf in a Virginia court.

38. On September 21, 2010, the same non-attorney in Mr. Ahmad's office wrote again telling Ms. Shervani that the "demand letter is almost ready."

39. Over the ensuing months, Ms. Shervani continued to provide information to Mr. Ahmad regarding her ongoing medical treatment. However, as of April 28, 2011, Mr. Ahmad had not settled Ms. Shervani's claim, nor filed an action on her behalf. As Mr. Ahmad was not a member of the Virginia Bar, neither Mr. Ahmad nor the HMA Law Firm were able to file any action in a Virginia Court. Mr. Ahmad did not provide this information to Ms. Shervani.

40. The statute of limitations on Ms. Shervani's lawsuit ran on April 28, 2011; at no time prior to the expiration of the limitations period did Mr. Ahmad advise her that the statute of limitations was April 28, 2011, or that she was required to settle her claim or file a lawsuit on or before that date or the claim would otherwise be barred. Instead, Mr. Ahmad lead Ms. Shervani

9

to believe that the statute of limitations in her case had not run because she was continuing to receive medical treatment for the injuries she had sustained in the collision.

41. On May 17, 2011, Mr. Shervani asked to see a copy of a demand letter if, in fact, one existed. Despite Mr. Ahmad's representations by and through his agents that such a letter was being prepared, no such letter was ever provided.

42. On June 13, 2011, in response to Ms. Shervani's concerns regarding how long it was taking to resolve her case, Mr. Ahmad wrote to her, this time reiterating his prior representations that in Virginia, the "continuing treatment doctrine tolls the running of the statute of limitations" and further advised her that "So long as you were seeking treatment and we can show there was a physician-patient relationship (which of course there has been) – the statute of limitations is tolled." Mr. Ahmad closed out that communication by telling Ms. Shervani that it was "Better to file when the treatment is close to finishing so we can move the lawsuit on." A copy of the aforesaid email is attached as **Exhibit F**.

43. On February 2, 2012, Mr. Ahmad wrote to Ms. Shervani and advised that the insurance carrier was "lowballing" her by offering to pay \$2,969.00 for medical bills incurred by Ms. Shervani, telling her that he would "send a more formal demand package soon" and that "it appears we will be filing a lawsuit." Mr. Ahmad also told Ms. Shervani "do not worry." Ms. Shervani responded, concurring with Mr. Ahmad's statement that "There is no option but to file a lawsuit…." She also asked Mr. Ahmad to let her know what she needed to do, and noted that she had been trying to get in touch with him to provide information regarding her medical treatment. A copy of the aforesaid email is attached as **Exhibit G**.

44. Mr. Ahmad did not obtain his license to practice law in Virginia until June 15, 2012, that being the first day he would have been authorized and able to file an action on Ms.

10

Shervani's behalf, and which date was more than 1 year after the statute of limitations on Ms. Shervani's claim had expired.

45.     On or about August 3, 2012, Mr. Ahmad received a letter from the insurance carrier informing him it had closed its file and that no further payments would be issued. Mr. Ahmad did not inform Ms. Shervani of this communication or provide her with a copy of the same.

46.     On December 11, 2012, Mr. Ahmad wrote to Ms. Shervani stating that he wanted to meet with her to go over everything so he could "finish drafting the complaint" and get her case filed. At no time did Mr. Ahmad inform Ms. Shervani that the statute of limitations on her case had run over a year before.

47.     On January 3, 2013, Mr. Ahmad wrote to the representative of the insurance carrier advising that he was "still preparing documentation to sue Geico" and that he was "still the lawyer in the case." There is no direct right of action in Virginia; the insurance carrier of an individual at fault in a collision cannot be sued.

48.     On February 3, 2013, Mr. Ahmad wrote to the same representative and provided him with a copy of the lawsuit he had prepared on behalf of Ms. Shervani against Ms. Pena.

49.     On or about February 23, 2013, Mr. Ahmad provided Ms. Shervani with a copy of the lawsuit. It listed Mr. Ahmad, individually, as her attorney. A copy of the Verified Complaint filed by Mr. Ahmad is attached hereto as **Exhibit H**.

50.     When Ms. Pena's counsel made it clear that they intended to raise the bar of the statute of limitations which had run on the claim almost 2 years earlier, Mr. Ahmad sought the entry of a nonsuit order; however, given that the statute of limitations had expired, Ms. Shervani had no ability to refile the case against Ms. Pena in any event.

11

51.     On March 4, 2013, Mr. Ahmad wrote to Ms. Shervani, and for the first time, admitted he had failed to timely file her case. A true and accurate copy of said email is attached as **Exhibit I**.

52.     Mr. Ahmad expressly represented to Ms. Shervani that he was an able and competent attorney and would be able to handle her case despite not being a licensed Virginia attorney.

53.     Mr. Ahmad further represented that Mr. Nubani, a licensed Virginia attorney, would be the "attorney of record" on her case.

54.     Mr. Ahmad made the aforesaid representations so as to make Ms. Shervani believe that Mr. Ahmad was, in fact, able and competent to handle her case and so as to induce Ms. Shervani to enter into the Retainer Agreement and, in fact, retain Mr. Ahmad to handle her case.

55.     Notwithstanding his representations to Ms. Shervani that he was able and competent to handle her case, Mr. Ahmad had no experience in personal injury cases; his practice was limited to immigration matters and he had no experience in handling a personal injury claim.

56.     Notwithstanding Mr. Ahmad's representations to Ms. Shervani that Mr. Nubani would serve as "attorney of record" for Ms. Shervani's case, Mr. Nubani had no involvement with Ms. Shervani's case; he was never asked to review it by Mr. Ahmad nor was he ever consulted in any respect by Mr. Ahmad, including on the issue of the statute of limitations. Mr. Nubani also was never requested by Mr. Ahmad to file any action on behalf of Ms. Shervani at any time, including prior to the expiration of the statute of limitations.

12

57.     Moreover, Mr. Nubani had never handled a personal injury claim as an attorney for a client, nor did he have any experience or expertise in personal injury claims. His practice was limited to immigration matters.

58.     At no time between when he was retained and the date the statute of limitations expired was Ms. Ahmad licensed to practice law in Virginia, nor was there anyone in his office who was a Virginia licensed attorney.

59.     Ms. Shervani reasonably relied upon Mr. Ahmad's representations, and in agreeing to be represented by him, placed her trust and confidence in him, and reasonably believed that he would act to protect her interests.

60.     Mr. Ahmad's representations were false or made with reckless disregard for their truth and were made for the purpose of inducing Ms. Shervani to retain him to represent her interests in her personal injury claim, and to induce her to continue his representation of her.

61.     At all times, Mr. Ahmad had a duty to use a reasonable degree of care, skill and diligence in representing Ms. Shervani.

62.     Contrary to his representations, Mr. Ahmad wholly failed to meet the standard of care required of him in his representation of Ms. Shervani, in particular, failing to have the fundamental and basic knowledge that in the Commonwealth there is a two (2) year statute of limitations for personal injury claims, that the continuing treatment rule did not apply to Ms. Shervani's claim, and that a claim for personal injuries must be settled before the expiration of the statute of limitations, or if not settled, a Complaint for such a claim must be filed, within two (2) years of the date of the injuries.

63. Mr. Ahmad did not settle Ms. Shervani's claims or file a Complaint seeking recovery for her injuries until February 13, 2013, almost twenty-two (22) months after the expiration of the statute of limitations.

64. As a direct and proximate result of her reliance upon the representations of Mr. Ahmad, his omission of material information regarding his competence, experience and skill, and his breach of the standard of care required of attorneys handling such matters, Ms. Shervani has been caused to sustain and continues to sustain damages.

WHEREFORE, Shamsiya F. Shervani, prays for judgment in her favor and against Defendants, Hassan M. Ahmad and The Hassan M. Ahmad Law Firm PLLC, doing business as The HMA Law Firm, jointly and severally, in an amount of at least Five Hundred Thousand 00/100 Dollars ($500,000.00); her costs expended herein, including reasonable attorney's fees; and a determination that such judgment is not dischargeable in bankruptcy.

**Shamsiya F. Shervani, Plaintiff**
*By Counsel*

**O'CONNOR & VAUGHN, LLC**
11490 Commerce Park Drive, Suite 510
Reston, Virginia 20191
(703) 689-2100 Telephone
(703) 471-6496 Facsimile

By: */s/ Robert L. Vaughn, Jr.*
    Robert L. Vaughn, Jr., VSB 20633
    *Counsel for Plaintiff*

14

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2015, I caused a true copy of this Amended Complaint to be served on all parties of record via the Court's ECF filing system and have also faxed a copy to:

Benard J. DiMuro, Esq.
DiMuro Ginsberg PC
1101 King Street, Suite 610
Alexandria, Virginia 22314
**FACSIMILE NO. 703-548-3181**

/s/ Robert L. Vaughn, Jr.
Robert L. Vaughn, Jr.



Hassan Ahmad <hahmad@nubaniahmad.com>

## Car Accident (Neha Friend)

6 messages

**Shamsiya Shervani** <shamsiya@gmail.com>
To: hahmad@nubaniahmad.com

Mon, May 25, 2009 at 8:03 PM

Salam Hassan,

My name is Shamsiya, I am Neha Friend.. I believe that she has spoken to you about me to you. The reason I am contacting you in regards to a car accident I had 4 weeks ago on 4/28/2009.

Let me brief you about the accident and the reason for me to get some legal help..

On April 28th I was going home and was standing at the exit red light of 7100 and Spring St.. There was a car in front of me waiting to make a right hand turn, The light was red. I came off the ramp and stopped my car behind the car in front so I could make a right hand turn after the front car. My car was stopped and out of no where the next thing I know is that I have been hit from behind and my car hit the car in front. I felt the wind knocked out of me and felt my whole spinal column move.

After a minute or so I got out of the car and saw the damage on my car and the car in front and asked both the car drivers to move the cars into the service lane so we could exchange insurance information. After moving the cars to the service lane the lady that hit my car form behind said that her insurance will pay for my car repair and my insurance will pay for the car I hit.. That's when I said that no my insurance is not suppose to pay for the car and medical damages it is your that has to cover the expense.. She did not want the insurance to be involved and wanted to pay out of pocket for the car damage, and did not consider the medical expense was needed..

The car that I hit wanted a police report since they were from out of the country and had a rental and wanted a report otherwise the rental company will make them pay for the repairs. So the lady said "Oh I'll call them I do this all the time" I don't know what that meant. We all waited for the police to arrive and once the police arrived the whole situation was told to him, then he determined that it was the lady that hit my car form behind was at fault and her insurance will cover all the car as well as the medical expenses..

I went home and called my insurance company to inform them of the accident. They took all my information and I was told that after someone is assigned to my case I will be contacted.. I was then contacted by my representative and the other ladies representative, both of them told me to keep all the receipt's, and keep note of all the medical help I have needed concerned with this accident. I have sent them all the information they have requested for example names and contact information of all the Dr's and ER visits.

I have had to take time off form work because the pain has been so severe and also to go for PT for my knee, hip, neck, shoulder and back since they were all strained due to the accident. And have been to the ER 2 times due to unbearable pain.

After sending them all the information they have requested, I got a letter form my insurance company saying that my case is getting very complicated because they can not understand why my medical expenses are so much when the car damage was only $770/-. My insurance company is asking for my 5 year medical history and would also like to have me evaluated by an independent doctor.

A little about my medical history, before the accident I had been going for physical therapy (PT) for my neck for a bulging disk I had my last PT appointment was on 30th April 2009 where my therapist was going to give me the green light that my neck was good and I was able to manage it on my own.. I spent 2-2/12 month in PT and was able to do day to day work with no problem and this accident has set me back.

EXHIBIT
A

Inspite of having a bulging disk I was able to lead a regular life go to work take my daughter for all her activities go everyday to the GYM and have a good workout. For the past 4 weeks my whole life has been turned upside down. I have been in so much pain that I have not been able to do my regular day to day work. I can not explain how much inconvenience, pain and anguish this has caused me from effecting my work and personal life.

I would like your help if you take cases like this.. I can just see that this is getting to be a nightmare for me to handle that is why I need some legal assistance. I will be glad to give you more details about my Dr's and ER visits if you represent my case.

Regards,
Shamsiya

--

---

Pride belongs to those who know how to keep their honour

'Friendship doubles joys and reduces sorrows by half (Francis Bacon)

---

**Hassan M. Ahmad, Esq.** <hahmad@nubaniahmad.com>                           Tue, May 26, 2009 at 9:02 PM
To: Shamsiya Shervani <shamsiya@gmail.com>
Cc: Ashraf Nubani <anubani@nubaniahmad.com>

WS Shamsiya,

Thank you for writing. I apologize for not responding sooner as I was out of the office on vacation until today.

It appears you need representation. From your story it appears we should be able to handle your case. The attorney of record will be my partner, Ashraf Nubani, Esq., who is cc'ed on this email, as he is licensed in Virginia (I am currently licensed only in Maryland and it appears your case is in Virginia) However, you will be hiring the firm and can feel free to contact me or Mr. Nubani after representation has begun.

If you want to get started, we would need you to come to our office with ALL paperwork you have so that we can complete an initial intake. We advise you not to make ANY statements to any insurance agent or anyone else, as statements you make can affect findings of liability, as well as potentially adversely affect the amount of damages you may be entitled to receive.

It already apparent the medical bills will become an issue.

Please contact my office at (703) 658-5151 x2 tomorrow afternoon so we can set up an time for you to come in. It is better to come in soon before you are pressured into accepting a deal that may not be in your best interest.

We look forward to hearing from you and pray for your speedy recovery through this difficult time.

Warmly,

Hassan M. Ahmad, Esq. | NUBANI & AHMAD PC
1568 Spring Hill Road Suite 222 McLean VA 22102
o: 703.658.5151 | f: 703.997.8556
www.nubaniahmad.com



EMAIL ADVISORY:

# CIVIL REPRESENTATION & FEE AGREEMENT

Shamsiya Shervani, "Client(s)" agree to retain the NUBANI & AHMAD ("the Firm") with regard to personal injury matter on the terms and conditions set forth in this Retainer Agreement. Any correspondence, notices or copies shall be sent to the address listed below unless written notice of address change is submitted. Representation will not commence until receipt of an executed copy of this Agreement and the agreed upon fees and costs are deposited.

## §1 Fees (Only the paragraph(s) marked with a "✓" apply)

☐ A flat fee of $ which is in the maximum fee that will be charged the client in the above-noted matter. Client shall deposit $, plus any additional amounts listed below, before representation will begin The balance of the fee is to be paid as follows: . The flat attorney fee quoted by the Firm includes **reasonable** telephone calls, conferences, correspondence, file review, and the preparation, filing and processing of the case.

☐ Billed at the rate of $ per hour, calculated in increments of one-tenth of an hour. You are required to deposit an engagement fee of $, of which one hundred percent (100%) will be the **minimum** fee to be charged to you in this case. Phone calls between 6 PM and 8 AM weekdays or during the weekends will be subject to an after hours charge of $. At such time as the retainer deposit falls below $250, you must deposit an additional sum based on our best estimate of work remaining to be done to ensure that work on your case is not interrupted or delayed.

☒ Contingent fee of 33⅓% of the gross amount recovered (i.e., before any deductions for expenses of medical bills, etc.) if settled without suit; 40% of amount recovered after suit is filed or 50% of amount recovered if suit is appealed. You are required to deposit a nonrefundable engagement fee of $0, to be applied to the amount of recovery, if any. If there is no recovery, said engagement fee is not refundable under any circumstance.

☐ An additional sum of $ is required and will be held in escrow for use in paying any costs associated with your case (e.g., filing fees, court costs, etc..) When this sum has been depleted, an additional amount will be required.

☒ The Firm will include in any billing, and you agree to pay on demand, any time already expended by the Firm and related to this case even through that time was expended prior to the date of this agreement. In other words, Client(s) understand that billing begins at the time the Firm was originally consulted, at the rates and on the basis stated herein.

## §2 Authorization to Retain Experts

You are authorizing the Firm to retain such other associate counsel, investigators and expert witnesses as may be deemed necessary. Any and all costs, including investigations, expert witness fees, discovery, court costs and long distance calls will be billed on a monthly basis and are payable upon billing.

## §3 Payment of Costs, Attorney Lien on Recovery



20090303

Client agrees to pay to the Firm all actual necessary expenses paid or incurred by the Firm in connection with such litigation or settlement and authorizes the Firm to deduct the same from Client's share of any amount recovered. The Firm shall have a lien for payment of his fee on all monies or property received in settlement of this claim or recovered by judgment or decree, execution, garnishments, or by any other proceeding whatsoever.

## §4   Termination

Client may elect to terminate this Agreement at any time, but in such case, this Firm will be entitled to compensation of $250 for each hour the Firm has logged on the case until the time of termination. There will be a minimum $100 administrative charge for opening Client's file.

## §5   No Warranties

This Firm makes no warranties or representations concerning the successful termination of this matter or the favorable outcome of any legal service provided. This Firm does not warrant or guarantee that we will obtain a reimbursement for any of your costs or expenses in this matter. All statements of this Firm on these matters are statements of opinion only. This Firm may, at any time, in its absolute discretion, withdraw as counsel from this matter if it is felt that the case lacks sufficient merit or a conflict of interest arises between attorney and client.

_____   6/1/2009
Client(SEAL)                 Date

CLIENT CONTACT INFORMATION

13600  RED SQUIRREL WAY
Number and Street

_____   _____
Client(SEAL)                 Date

HERNDON          VA      20171
City              State    ZIP

_____   6/1/2009
AttorneySignature            Date

Home Phone

Work Phone

Cell Phone

shamsiya @ gmail.com
Email Address

# THE HASSAN M AHMAD LAW FIRM PLLC

Hassan M. Ahmad, Esq.*
1568 Spring Hill Rd, Suite 200A
McLean Virginia 22102

T: 703.964.0245
F: 703.997.8556
hma@hmalegal.com
www.hmalegal.com
*-Licensed in Maryland only

Of Counsel
Omar Baloch (NC)
Faisal Gill (CA CO DC NY)
Ashraf Nubani (NY VA)

November 11, 2009
McLean VA

## VIA FACSIMILE

Commomwealth Orthopaedics & Rehabilitation, PC
Attn: Billing Department

**RE:  Shamsiya Fatima Shervani**
**Patient#: 3128970**

Dear Sir or Madam:

This is to notify you that this Firm now represents the interests of Shamsiya Fatima Shervani.

Please forward all future inquiries to my attention either by e-mail at: hma@hmalegal.com or by fax at:
(703) 997-8556.

Thanks for your attention to this matter.

Respectfully,

Hassan M. Ahmad

HMA/no
Cc: Shamsiya Shervani



EXHIBIT

D

# THE HASSAN M AHMAD LAW FIRM PLLC

**Hassan M. Ahmad, Esq.\***
1568 Spring Hill Rd, Suite 200A
McLean Virginia 22102

T: 703.964.0245
F: 703.997.8556
hma@hmalegal.com
www.hmalegal.com
\*-Licensed in Maryland only

November 11, 2009
McLean VA

**VIA FACSIMILE**

Reston Hospital Center
Attn: Billing Department

Of Counsel
Omar Baloch (NC)
Faisal Gill (CA CO DC NY)
Ashraf Nubani (NY VA)

**RE:    Shamsiya Fatima Shervani**
**        Acount#: 85406788183**

Dear Sir or Madam:

This is to notify you that this Firm now represents the interests of Shamsiya Fatima Shervani.

Please forward all future inquiries to my attention either by e-mail at: hma@hmalegal.com or by fax at: (703) 997-8556.

Thanks for your attention to this matter.

Respectfully,

Hassan M. Ahmad

HMA/no
Cc: Shamsiya Shervani

# THE HASSAN M AHMAD LAW FIRM PLLC

**Hassan M. Ahmad, Esq.***
1568 Spring Hill Rd, Suite 200A
McLean Virginia 22102

T: 703.964.0245
F: 703.997.8556
hma@hmalegal.com
www.hmalegal.com
*-Licensed in Maryland only

November 11, 2009
McLean VA

**VIA FACSIMILE**

RIA at Sterling
Attn: Billing Department

Of Counsel
Omar Baloch (NC)
Faisal Gill (CA CO DC NY)
Ashraf Nubani (NY VA)

**RE:** **Shamsiya Fatima Shervani**
**Patient#: 1341159**

Dear Sir or Madam:

This is to notify you that this Firm now represents the interests of Shamsiya Fatima Shervani.

Please forward all future inquiries to my attention either by e-mail at: hma@hmalegal.com or by fax at: (703) 997-8556.

Thanks for your attention to this matter.

Respectfully

Hassan M. Ahmad

HMA/no
Cc: Shamsiya Shervani



**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

LLC-1103
(07/06)

**ARTICLES OF ORGANIZATION FOR A DOMESTIC**
**PROFESSIONAL LIMITED LIABILITY COMPANY**

Pursuant to Chapters 12 and 13 of Title 13.1 of the Code of Virginia the undersigned states as follows:

1. The name of the professional limited liability company is

THE HASSAN M AHMAD LAW FIRM, PLLC,

(See instruction on reverse for name requirements)

2. The professional limited liability company is organized for the sole and specific purpose of rendering the

professional services of _____ LAW FIRM _____ .

3. A. The name of the professional limited liability company's initial registered agent is

HASSAN MINHAJ AHMAD, ESQ. _____ .

B. The registered agent is (mark appropriate box):

(1)        an INDIVIDUAL who is a resident of Virginia **and**
&#9919; a member or manager of the limited liability company.
☐ a member or manager of a limited liability company that is a member or manager of the limited liability company.
☐ an officer or director of a corporation that is a member or manager of the limited liability company.
☐ a general partner of a general or limited partnership that is a member or manager of the limited liability company.
☐ a trustee of a trust that is a member or manager of the limited liability company.
☐ a member of the Virginia State Bar.

OR

(2)   ☐        a domestic or foreign stock or nonstock corporation, limited liability company or registered limited liability partnership authorized to transact business in Virginia.

4. The professional limited liability company's initial registered office address, including the street and number, if any, which is identical to the business office of the initial registered agent, is

_____ 1568 SPRING HILL ROAD, SUITE 200A _____ MCLEAN _____ , VA ___ 22102 _____ ,
(number/street)                              (city or town)                              (zip)

which is physically located in the X county or ☐ city of _____ FAIRFAX _____ .

5. The professional limited liability company's principal office address, including the street and number is

_____ 1568 SPRING HILL ROAD, SUITE 200A _____ MCLEAN _____ VA _____ 22102 _____ .
(number/street)                              (city or town)                    (state)      (zip)

Organizer(s):

_____ (signature)        06/09/2010 _____
                                              (date)

_____ HASSAN MINHAJ AHMAD, ESQ. _____        703-964-0245 _____
         (printed name)                                  (telephone number (optional))



SEE INSTRUCTIONS ON THE REVERSE

#### COMMONWEALTH OF VIRGINIA
#### STATE CORPORATION COMMISSION

AT RICHMOND, JUNE 18, 2010

The State Corporation Commission has found the accompanying articles submitted on behalf of

## THE HASSAN M AHMAD LAW FIRM, PLLC

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

## CERTIFICATE OF ORGANIZATION

be issued and admitted to record with the articles of organization in the Office of the Clerk of the Commission, effective June 18, 2010.

STATE CORPORATION COMMISSION

By

James C. Dimitri
Commissioner

DLLCACPT
CIS0339
10-06-15-0351

# Commonwealth of Virginia



## State Corporation Commission

*I Certify the Following from the Records of the Commission:*

The foregoing is a true copy of the articles of organization filed in the Clerk's Office of the Commission by THE HASSAN M AHMAD LAW FIRM, PLLC.

Nothing more is hereby certified.



*Signed and Sealed at Richmond on this Date:*
*July 8, 2014*

*Joel H. Peck*
*Joel H. Peck, Clerk of the Commission*



## Continuing Treatment Doctrine for statute of limitations

**Hassan Ahmad** <hma@hmalegal.com>                                    Mon, Jun 13, 2011 at 1:54 PM
To: Shamsiya Shervani <shamsiya@gmail.com>

"Virginia courts agree that the continuing treatment doctrine tolls the running of the statute of limitations while a patient is undergoing a "continuous and substantially uninterrupted course of examination and treatment" for a particular ailment. *Farley v. Goode,* 219 Va. 969, 252 S.E.2d 594, 599 (1979). In order for the continuing treatment doctrine to apply, a physician-patient relationship must exist over the course of treatment. *See Grubbs v. Rawls,* 235 Va. 607, 369 S.E.2d 683, 686 (1988)( "Part of our rationale in *Farley* was that as long as the physician-patient relationship continued as to a particular mal-ady or injury, then it could not be said that treatment had ceased.").

*Castillo v. Emergency Medicine Assoc.,* 372 F.3d 643 (4th Cir. 2004)

*See also Chalifoux v. Radiology Associates of Richmond Inc.* (Koontz) No. 100052, April 21, 2011

(http://www.courts.state.va.us/opinions/opnscvwp/1100052.pdf) which is a Virginia Supreme Court case just decided on April 21, 2011, which affirms the "continuing treatment" doctrine for purposes of medical malpractice/personal injury statute of limitations.

So as long as you were seeking treatment and we can show there was a physician-patient relationship (which of course there has been) - the statute of limitations is tolled.

We may have to do some arm-twisting to get them to recognize this - and survive a demurrer if we file - but because your treatment is taking much longer than anticipated when you first came to me, we cannot file too early and then have the case sit for the next 2 - 3 years while your treatment finishes. Better to file when the treatment is close to finishing so we can move the lawsuit on.

Hassan M. Ahmad, Esq.  |  THE HMA LAW FIRM PLLC
1037 Sterling Road, Suite 201, Herndon VA 20170
T 703.964.0245   F 703.997.8556   http://www.hmalegal.com

ADVISORY: This email may be privileged. If you are not the intended recipient, delete this email immediately. This email does NOT create an attorney-client relationship.



EXHIBIT
F



## Update from Geico

2 messages

**Hassan Ahmad** <hma@hmalegal.com>
To: Shamsiya F Shervani <shamsiya@gmail.com>

Thu, Feb 2, 2012 at 4:43 PM

Salam Shamsiya,

Wanted to get you an update on claims. Geico has (or will, by next Tuesday) completed their review of the meds and made a preliminary determination on what they will cover. It's not much - so it appears we will be filing a lawsuit. Remember this is standard lowballing.

I don't have the official letter yet, but should be getting it next week. On the phone they said they will cover the ER visit, 4 visits to Dr. Patel, and 10 PT sessions. Comes to only $2,969.00. I will send a more formal demand package soon but let me get the official notice first.

Again - do not worry, this does not mean they will not pay, it is just their standard lowball first offer.

Hassan M. Ahmad, Esq. | THE HMA LAW FIRM PLLC
1037 Sterling Road, Suite 201, Herndon VA 20170
T 703.964.0245 F 703.997.8556 http://www.hmalegal.com

ADVISORY: This email may be privileged. If you are not the intended recipient, delete this email immediately. This email does NOT create an attorney-client relationship.



EXHIBIT
G

VIRGINIA:.

# IN THE CIRCUIT COURT OF FAIRFAX COUNTY

Shamsiya SHERVANI )
13600 Red Squirrel Way )
Herndon, VA 20171 )
)
    Plaintiff, )
)
v. )    Case No.: **2 0 1 3  0 3 1 0 5**
)
Annie PEÑA )
2205 Coppersmith Sq. )
Reston, VA 20191 )
)
    Defendant )

## VERIFIED COMPLAINT

Shamsiya SHERVANI, Plaintiff, by counsel Hassan M. Ahmad, Esq., sues Annie PEÑA, Defendant, and in support thereof state as follows:

### RECITALS

1. Plaintiff Shamsiya Shervani is a resident of Fairfax County, Virginia..

2. Defendant Annie Peña is also a resident of Fairfax County, Virginia.

3. This action arises from an auto collision which occurred on April 28, 2009 in Fairfax County, Virginia. All events in this Complaint occurred in Fairfax County, Virginia.

4. Plaintiff has suffered an extensive and causally related series of injuries all directly attributable and the reasonably foreseeable results of said automobile collision.

5. As a result of said string of injuries, Plaintiff has sought and received a continuous course of treatment which continues to this day.

### STATEMENT OF FACTS

1



EXHIBIT H

6. Plaintiff is an adult female, born on August 6, 1976 and is a business analyst by profession, and prior to the auto collision, was in good health.

7. Plaintiff never complained about hip or neck pain prior to the accident. She maintained an active lifestyle, and a careful diet. She is 5'3" tall and weighs approximately 140 lbs.

8. On April 28, 2009 at approximately 3 pm, Plaintiff was carefully and prudently operating her silver 2004 Volkswagen Passat as she took the Spring Street exit off of southbound Fairfax County Parkway. At the bottom of the ramp was a traffic light, with the right hand turn being Spring Street and the left hand turn being Sunset Hills Road.

9. The light was red and there was a Hyundai Santa Fe sport utility vehicle waiting to make a right turn as well. Plaintiff was stopped a safe distance behind the Santa Fe.

10. Plaintiff's car suffered from no defect or malfunction that would have any noticeable effect on the events about to take place.

11. It was not raining that afternoon and the roads were dry and visibility was clear.

12. Suddenly Plaintiff's car was violently struck in the rear with such force that she felt her whole body jerk forward and then back again. All loose items in her car were immediately thrown forward and then back by the blunt force of the impact. Plaintiff's car was struck with such force that it hit the Santa Fe in front of it, too.

13. The airbags in Plaintiff's car did not deploy.

14. At all times, Plaintiff was properly restrained by her seat belt. Plaintiff's right knee violently struck the dashboard of her car, under the steering wheel on the right-hand side.

2

15. Plaintiff's car had been struck by a 2004 Honda Civic being driven by Annie G.B. Peña, Defendant herein. The car's registered owner was Karl Peña, Defendant's husband.

16. Damage to the vehicles was significant, but not extensive.

17. Up until that time, Plaintiff had been in good health.

18. The only condition suffered by the Plaintiff was a mild right knee injury sustained in December 2008 when she fell while roller skating.

19. Plaintiff had obtained an MRI of her right knee in February 2009 (about two months prior to the collision) and had nearly completed a regimen of physical therapy by the time of the accident, thereby fully or virtually fully restoring her injured knee.

20. After the accident, the passengers in all three vehicles involved in the accident exited their vehicles.

21. Defendant initially resisted calling the police, but upon Plaintiff's insistence, offered to call the police, exclaiming, "Oh, I'll call the cops, I do this all the time."

22. Officer L.C. Anderson was called to the scene. The Fairfax County police were called and determined that it was Defendant's failure to exercise reasonable care while operating her motor vehicle that was both the cause in fact and proximate cause of the accident.

23. After the accident, Plaintiff was able to drive home, which was approximately 3 miles away. She called her insurance company, Geico, and at that point, began to feel severe pain. She immediately called her supervisor at Fannie Mae and informed him that she would not be able to work the next day due to her having been in a car accident.

3

24. The night of the accident, Plaintiff took some pain pills and went to bed. However, when she awoke the next morning, she found herself in unusual and disconcertingly intense pain. Furthermore, she found it difficult to move.

25. That morning, Plaintiff described her pain at 8 on a scale of 1 to 10 with 10 being the highest.

26. Later the same day, on April 29, 2009, Plaintiff went to the emergency room at Reston Hospital in Reston, Fairfax County, Virginia and spent about 3 hours there. She complained of knee, neck, upper back, thoracic spine, and inguinal area pain. Significantly, she also complained of right hip pain. She was seen by Dr. Seon Lee, MD.

27. In Dr. Lee's examination notes, dated 4/29/2009, he stated that the problems Plaintiff was experiencing began on 4/28/2009 following motor vehicle accident. He noted injuries to the following areas: posterior neck and C-spine, right hip and inguinal are, right knee and upper back and thoracic spine.

28. Dr. Lee stated in his discharge instructions to Plaintiff that his examination of Plaintiff suggested that her injuries were due to a motor vehicle accident. He stated he had identified the following injuries during his examination of Plaintiff: contusion (bruising) and neck pain and injury. He warned however that is is very common to have little or no pain initially after the accident, but have increasing pain and stiffness as time goes on.

29. She was sent home after being given Vicodin® for pain, and Flexiral® as a muscle relaxant. She was further told to make a followup appointment with Dr. Klein for her right hip and right knee strain.

4

30. Still unable to go to work, Plaintiff saw her primary care physician Dr. Allen Howe, who advised to follow the advice of the emergency room doctor, and further gave her a slip to obtain an MRI of her cervical spine.

31. Plaintiff awoke the morning of April 30, 2009 with pain still at a level of "8" and was still unable to go to work. She slept most of the day due to being highly medicated.

32. Plaintiff had previously taken the day off on May 1, 2009 to accompany her daughter on a field trip. Not wanting to disappoint her daughter, she took heavier doses of pain medication, but was unable to function normally due to severe pain in her neck, which she reported as still at a level of 8.

33. The pain in her neck continued for the next three days and by May 6, 2009 had started getting even worse, reported as high as 8.5. That day she went to Commonwealth Orthopaedics and also complained about her right hip (again) and her right knee pain that she had been experiencing since her motor vehicle accident on 4/28/2009. For her neck, Plaintiff scheduled an appointment with a neck specialist at the earliest possible date of May 19, 2009, but also scheduled an MRI for her knee and cervical spine regions for May 13, 2009.

34. On May 7, 2009 Plaintiff began physical therapy in the morning. She was given a heat pack, then a cold pack, and then a vibrating machine. Unfortunately, the treatment made her feel nauseous and lightheaded. She tried to return to work later that morning but by 1 pm the pain had again become unbearable and she went home. On the way, she stopped to buy a soft neck collar as recommended by her primary care physician Dr. Allen Howe.

5

35. On May 8, 2009, still taking pain medications and wearing a soft collar all day, Plaintiff went to work. By the time she got home, the pain had reached a level of 9. It was so bad Plaintiff had to return to the emergency room, which she did.

36. At the emergency room at Reston Hospital, Plaintiff's pain medications were refilled, and she got a CT scan which showed muscle spasms. She got two shots, one in the right arm for nausea and one in the left arm for pain. She did not get home until approximately 11:30 pm that night.

37. Plaintiff slept until approximately 3:30 pm, controlling her pain with medications.

38. By May 10, 2009 the pain had reduced to 7; Plaintiff continued to rest and wear her soft collar.

39. On May 11, 2009 Plaintiff reported her pain as down to 6.5 and went to work with her soft collar.

40. On May 13, 2009 Plaintiff had taken the day off for the cervical (neck) and knee MRI. She had a prior MRI for her neck and knee in February of 2009 following her roller skating injury from December 2008. However, her hip was not examined by MRI. The pain had increased to 7 again.

41. Plaintiff continued to endure the pain for the next several weeks. On her followup appointment on May 19, 2009 with the neck specialist, Dr. Tushar Patel and his assistant Ryan Fitzmorris, she was told that it would take 6 to 8 weeks for the pain to subside. The pain continued between 5 and 7 for the rest of the month of May, 2009.

42. On May 19 she visited her doctor at Commonwealth Orthopaedics, who diagnosed her with a cervical strain secondary to her motor vehicle accident with underlying degenerative changes in her C-spine. Her doctor asked her to return for six physical therapy sessions and prescribed her Voltaren® 75 mg.

6

43. Plaintiff went on a trip to India in July of 2009 that had been previously scheduled prior to the collision. She found the extended trip in the airplane exceedingly uncomfortable.

44. Plaintiff maintained her physical therapy regimen while abroad.

45. On her return to the United States several weeks later, Plaintiff continued to complain about the pain in her hip, inguinal area, neck, and shoulder.

46. On September 9, 2009, she visited Dr. Klein. He noted that Plaintiff complained of experiencing right hip pain since her motor vehicle accident in April 2009. Specifically, he noted she had pain in her leg, anterior groin, and pain radiating into her medial thigh down her leg. Her pain level at that visit was a 3 to 4 out of 10, which the pain increasing during exercises. He noted her pain was worse over the previous few weeks but has been evidence since her motor vehicle accident. He requested she obtain an MRI of her right hip.

47. On October 12, 2009, an MRI was performed of her right hip.

48. On October 19, 2009, Plaintiff returned for an evaluation by Dr. Klein. He reviewed the MRI of her hip and found that it revealed evidence of possible femoral acetabular impingement, where the top of the femur (thigh bone) does not fit normally in the socket joint of the hip. He noted she continued to complain of legal pain and moreover, that it "originated about the same time as her accident."

49. Dr. Klein referred her to Dr. Andrew Parker, who began seeing Plaintiff to help her with her ongoing right hip pain.

50. It was Plaintiff's right knee that had violently struck the dashboard, and Plaintiff had never before complained of right hip pain.

51. On November 4, 2009, Plaintiff underwent an IR Hip Injection for diagnostic purposes. She received temporary relief from the injection.

7

52. After her injection, on November 13, 2009, Dr. Parker recommended she consider undergoing right hip anthroscopy.

53. On January 4, 2010, Plaintiff visited Dr. Parker for initial evaluation of her left hip. He noted in his report that in the previous month she had developed mild anterior hip and groin pain and clicking sensations. He also noted that she was scheduled to undergo right hip arthroscopy in May 2010. Dr. Parker prescribed Voltaren 75 mg.

54. On March 12, 2010, Plaintiff visited Dr. Parker for a preoperative consultation regarding her left hip. He noted she continued to have anterior hip and groin pain with clicking sensations.

55. On May 4, 2010, as a direct and proximate and reasonably foreseeable result of the collision, Plaintiff underwent right hip arthroscopy with labral debridement, right hip arthroscopic synovectomy, and right hip arthroscopic femoral osteoplasty in an attempt to correct the femeroacetabular impingement.

56. After her hip surgery, Dr. Parker recommended Plaintiff begin physical therapy. He also placed her on Voltaren® 75 mg and gave her Norco® for pain control.

57. After Plaintiff's hip surgery, as a direct and proximate and reasonably foreseeable result of the collision, she used crutches for four months and began physical therapy with Commonwealth Orthopaedics.

58. Plaintiff visited Dr. Parker on July 29, 2010 for postoperative evaluation of her right hip. She continued to report mild residual anterior hip pain.

59. On September 9, 2010, Plaintiff visited another doctor, Dr. Trucksess who reported that Plaintiff complained of "right leg shaking and shivering symptoms." Dr. Trucksess ordered an EMG nerve conduction study to uncover the cause of these symptoms.

8

60. Plaintiff also visited Dr. Parker on September 9, 2010. Dr. Parker noted that she continued to report spasms in her right hip flexor muscles which began after her automobile accident. Dr. Parker stated in his notes that the nerve conduction study was to be done to evaluate for potential nerve damage from her previous automobile accident.

61. Plaintiff also reported that she had developed wrist pain while using her cane for assisted ambulation.

62. Because of Plaintiff's continuing tremors, Dr. Parker referred her to a neurologist for an evaluation.

63. As a direct and proximate and reasonably foreseeable result of the collision, Plaintiff continued to experience large amounts of wrist pain as a result of being on crutches for four months.

64. On October 10, 2010, a Dr. Pettrone treated Plaintiff's wrist pain by injecting her with Celestone 6 mg.

65. On October 25, 2010, Plaintiff visited a neurologist, Dr. Cintron, who ordered that an MRI of her thoracic spine and her brain be conducted to determine the source of her tremors.

66. Plaintiff continued to experience wrist pain in November and December 2010, and her doctor ordered an MRI of her wrist. An MRI of her wrist was completed on December 10, 2010. On December 28, 2010, as a direct and proximate and reasonably foreseeable result of the collision, her doctor performed a left ECU tendon injection was performed.

67. On January 3, 2011, Plaintiff again visited Dr. Parker. Dr. Parker stated in his notes that Plaintiff continued to report mild stiffness in her right hip, which

9

discomfort did not exist prior to the collision, and also reported lower abdominal pain. Dr. Parker ordered an ultrasound to be performed to rule out a sports hernia.

68. On January 4, 2011 Plaintiff underwent an ultrasound. The ultrasound revealed Plaintiff had a 3.6 cm hernia sac in her right inguinal (groin) region.

69. The inguinal hernia was a direct and proximate and reasonably foreseeable result of the collision.

70. On January 10, 2011, Dr. Parker referred Plaintiff to for inguinal hernia repair.

71. As a direct and proximate and reasonably foreseeable result of the collision, Plaintiff continued to experience spasms and continued her visits to her neurologist, Dr. Cintron.

72. Plaintiff visited Dr. Pettrone on April 8, 2011 and reported experiencing right shoulder pain. She rated her pain as 9 out of 10.

73. On May 17, 2011, Plaintiff had a checkup with Dr. Pettrone for followup of her right shoulder pain, left wrist pain and electromyography (EMG) of her fingers. EMG is a test by which the treating physician can determine the electrical activity of skeletal muscles.

74. Dr. Pettrone diagnosed Plaintiff with a left wrist Triangular fibrocartilage complex (TFCC) tear and right shoulder impingement. Dr. Pettrone recommended she undergo a wrist arthroscopy, a minimally invasive surgical technique allowing for many common types of joint repairs.

75. On June 16, 2011, Plaintiff underwent inguinal hernia surgery as a direct and proximate and reasonably foreseeable result of the collision.

76. On June 29, 2011 Plaintiff underwent left wrist arthroscopy and TFCC repair and a right shoulder injection, as a direct and proximate and reasonably foreseeable result of the collision.

10

77. On August 2, 2011, Dr. Pettrone recommended that Plaintiff start therapy for her wrist.

78. On August 18, 2011 Plaintiff visited Dr. Parker for evaluation of her right shoulder. Due to her ongoing shoulder pain, Dr. Parker placed her on Voltaren® 75 mg.

79. On August 26, 2011, Plaintiff visited her physical therapist. Her physical therapist noted her current pain levels were between 4 and 6 out of 10, she diagnosed plaintiff with right rotator cuff tendonitis. She reported Plaintiff had continuing right shoulder pain that had been increasing over time. Plaintiff reported to her physical therapist that she has pain working at her computer for more than two hours.

80. During fall 2011 Plaintiff continued physical therapy for her right shoulder.

81. On October 10, 2011 when Plaintiff was discharged from physical therapy for her wrist, she still experienced pain levels of 4 – 5 out of 10 when she used her wrist.

82. On November 10, 2011, Plaintiff visited Dr. Andrew Parker and reported continued pain and stiffness in her right shoulder, which pain did not exist prior to the collision. She also reported anteromedial knee pain. Dr. Parker prescribed that she begin physical therapy for both knees.

83. Plaintiff had not experienced knee pain since immediately after the collision.

84. On December 5, 2011, Plaintiff's physical therapist reported to Dr. Parker that Plaintiff was diagnosed with bilateral chondromalacia patellae. She stated that Plaintiff had knee pain that had increased with ambulation and had difficulty sitting for long periods of time. She reported Plaintiff's pain scales were 3/10 normally, at best 1/10 and at worst 7/10.

11

85. On December 28, 2011, Plaintiff's physical therapist wrote a letter to Dr. Parker stating that Plaintiff was making only limited progress with physical therapy. She therefore discharged the Plaintiff until she could be tested further.

86. On December 29, 2011 Plaintiff underwent a right shoulder arthrogram, a test I which the affected area is imaged with a high-contrast medium to enable the treating physician to determine the presence and extent of abnormalities. The arthogram revealed that Plaintiff had an impingement in the subcromial space with bursitis, a partial thickness rotator cuff tear and evidence of an anterior labral tear.

87. On January 26, 2012, Plaintiff visited Dr. Parker and reported she continued to experience shoulder pain, which pain had not existed prior to the collision. Dr. Parker recommended that if her symptoms persisted, she would be a good candidate for right shoulder arthroscopy. Plaintiff decided to undergo arthroscopic surgery for her right shoulder in June 2012, although the surgery was later moved to October 6, 2012.

88. Because Plaintiff continued to experience wrist pain, her doctor ordered a right wrist MRI scan.

89. On August 27, 2012, Plaintiff visited Dr. Patel concerning her lower back pain. He suggested she undergo an injection to mitigate the pain. Dr. Patel prescribed her with Mobic® 7.5 mg.

90. On October 19, 2012, Plaintiff underwent a short surgery to remove a foreign body from her left wrist. She also underwent a right shoulder scope, rotator cuff repair, subcromial decompression, and labral repair.

12

91. After her shoulder surgery, Dr. Parker prescribed for Plaintiff to begin physical therapy, and prescribed the strong painkiller Dilaudid® and Voltaren® for pain control and inflammation.

92. Plaintiff's physical therapist wrote to Dr. Parker on October 30, 2012, reporting that Plaintiff's current pain levels were 3/10, and that her worst pain level is 8/10, levels of pain that Plaintiff had never experienced until the collision. She stated that Plaintiff was undergoing physical therapy for both her right shoulder and both of her knees.

93. On November 9, 2012, Plaintiff visited Dr. Protopapas for her back pain. She stated that her current pain level was 3 out of 10. Dr. Protopapas performed a Diagnostic Lumbar Medial Branch Block Procedure on Plaintiff.

94. To date, Plaintiff still has pain in shoulder, neck, upper back, lower back, and right knee.

95. Plaintiff has been in a continuous course of treatment for injuries sustained in the collision, all conditions which are the direct and proximate result of said collision, and moreover are all reasonably foreseeable injuries and complications.

96. The fibromyalgia doctor Claudia Saba at Reston Medical Center in Reston, Fairfax County, Virginia has given additional pain medications to Plaintiff to help with neck/back/shoulder/knee pain from which she continues to suffer.

97. Plaintiff sustained serious personal injuries in the collision, all of which have significantly, permanently and negatively affected her quality of life, enjoyment, and peace of mind.

98. To date, Plaintiff has sustained medical bills from the date of the collision totaling $77,695.00 and out-of-pocket expenses totaling $494.69.

13

99. To date, Plaintiff has lost wages in 2010 totaling $4,320.00 and in 2009 totaling $2,705.00, for a total of $7,025.00.

100. Plaintiff has to date suffered actual damages of an amount no less than $85,214.69.

## COUNT ONE

Plaintiff realleges and incorporates by reference all those facts and allegations in all preceding paragraphs as if fully set forth herein, and further alleges:

101. The collision was caused by the reckless, carelessness and negligence of the Defendant Annie Peña, for that among other acts and omissions the Defendant:

    a. operated the motor vehicle at a high, dangerous and excessive rate of speed under the circumstances then and there existing;

    b. failed to reduce speed to avoid a collision;

    c. failed to observe due care and precaution and to maintain proper and adequate control of the motor vehicle;

    d. failed to keep a proper lookout for other vehicles lawfully upon the highway;

    e. failed to exercise reasonable care in the operation of the motor vehicle under the circumstances then and there existing; and

    f. In other respects not now known to the Plaintiff but which may become known prior to or at the time of trial.

102. As a direct and proximate result of the negligence and carelessness of Defendant, Plaintiff Shamsiya Shervani:

    a. suffered serious, painful and permanent bodily injuries, great physical pain and mental anguish, severe and substantial emotional distress, loss of the capacity for the enjoyment of life;

14

b.  was, is and will be required to undergo medical treatment and to incur medical costs and expenses in order to alleviate injuries, pain and suffering;

c.  was, is and will be precluded from engaging in normal activities and pursuits, including a loss of ability to earn money and of actual earnings;

d.  and, otherwise hurt, injured and caused to sustain losses.

103. All of the Plaintiff Shamsiya Shervani's losses were, are and will be due solely to and by reason of the carelessness and negligence of the Defendants, without any negligence or want of due care on the Plaintiff's part.

WHEREFORE, Plaintiff Shamsiya SHERVANI claims Four Hundred Twenty-Six Thousand Seventy-Three Dollars And Forty-Five Cents (\$426,073.45) in damages.

**I swear under pain and penalty of perjury that the contents of the foregoing complaint are true and correct to the best of my knowledge, information and belief.**

Shamsiya SHERVANI, Plaintiff

WE ASK FOR THIS:

Shamsiya SHERVANI, by counsel

Hassan M. Ahmad, Esq. (VSB #83428)
1039 Sterling Road, Suite 204
Herndon, VA 20170
T: (703) 964-0245
F: (703) 997-8556
hma@hmalegal.com
Attorney for Plaintiff

15

## FAIRFAX CIRCUIT COURT
## CIVIL CASE COVERSHEET

**2013 03105**

**Parties:**

| Plaintiffs | Defendants |
|---|---|
| 1. Shamsiya SHERVANI | 1. Annie PEÑA |
| 2. | 2. |
| 3. | 3. |

**\*Plaintiff proceeding without Counsel – Address and Daytime Phone Number required on Complaint**

**Plaintiff Attorney:**

Name: Hassan M. Ahmad, Esq.          Bar ID: 83428

Firm: The HMA Law Firm, PLLC

Street: 1039 Sterling Road, Suite 204

City: Herndon          State: VA          Zip: 20170

Phone Number: (703) 964-0245          Fax Number: (703) 997-8556

E-mail Address: hma@hmalegal.com

**Nature of Complaint** (Check only one)          **\* Cases in the Civil Tracking Program**

| | | |
|---|---|---|
| Administrative Appeal | Defamation * | Malpractice – Medical * |
| Affirmation of Marriage | Delinquent Taxes * | Mechanics/Vendors Lien * |
| Aid & Guidance | Eminent Domain | Partition * |
| Appeal Decision of Board of Zoning | Encumber/Sell Real Estate | Personal Injury – Assault * |
| Appeal of Process/Judicial Appeal | Erroneous Assessments | ✓ Personal Injury – Auto * |
| Appointment Church/Organization Trustees | Expungement | Personal Injury – Emotional * |
| Arbitration | False Arrest/Imprisonment* | Personal Injury – Premises Liability* |
| Attachment | Fiduciary/Estate Complaint | Property Damage* |
| Complaint – Equity * | Garnishment–Federal–180 days | Products Liability* |
| Complaint – Legal Cause of Action * | Garnishment–Wage–180 days | Quiet Title * |
| Compromise Settlement | Garnishment–Other – 90 days | Real Estate * |
| Condemnation* | Guardian/Conservator Adult | Restoration of Driving Privilege |
| Confession of Judgment | Guardianship/Minor | Vital Record Correction |
| Construction * | Injunction | Writ Habeas Corpus |
| Contract * | Interpleader | Writ Mandamus |
| Conversion* | Insurance * | Wrongful Death* |
| Court Satisfaction of Judgment | Judicial Review | Wrongful Discharge * |
| Declare Death | Malicious Prosecution * | OTHER: |
| Declaratory Judgment * | Malpractice – Legal * | |

**Damages in the amount of $ 426,073.45** are claimed.

**Requested Service:** Sheriff☐ Private Process Server☐ DMV✓ Secretary of Commonwealth☐
State Corporation Commission☐ Publication☐ No Service at this time☐

CCR D-90 Civil Coversheet (Revised – October 2011)



## Statute of Limitations - Bad News

**Hassan Ahmad** <hma@hmalegal.com>
To: Shamsiya F Shervani <shamsiya@gmail.com>

Mon, Mar 4, 2013 at 6:32 PM

Dear Shamsiya,

Salam. I really don't know how else to tell you this. It appears I was wrong about your case. It should have been filed in 2011. The continuum of care doctrine I told you about back then apparently does not apply.

This means your case is time-barred. The statute of limitations has run. We cannot get a settlement. I was wrong, and I accept responsibility for it.

You need to consult with another lawyer immediately because you may have a cause of action against me.

In the meantime, I have no choice but to file a nonsuit of the case, which cannot go forward at this time. This will give you up to 6 months to bring it back if there is a chance in doing it - though it does not appear there is any chance. Basically, it will buy some time.

If you want to talk, please feel free to call me directly on my cell phone at 301.335.1611.

I am really sorry. I apologize for this dreadful wrong and all the hurt and pain you've endured since the accident and everything else you've been through. I hope you can one day forgive me.


Hassan M. Ahmad, Esq.  | THE HMA LAW FIRM PLLC
1039 Sterling Road, Suite 204, Herndon VA 20170
T 703.964.0245   F 703.997.8556  http://www.hmalegal.com

ADVISORY: This email may be privileged. If you are not the intended recipient, delete this email immediately. This email does NOT create an attorney-client relationship.



EXHIBIT
I